93 N.J. Super. 6 (1966)
224 A.2d 505
JUAN ANTONIO RIVERA, PETITIONER-RESPONDENT,
v.
GREEN GIANT COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 1966.
Decided November 22, 1966.
*8 Before Judges GAULKIN, LEWIS and LABRECQUE.
Mr. Sidney M. Schreiber argued the cause for appellant (Messrs. Schreiber, Lancaster & Demos, attorneys).
Mr. Sol D. Kapelsohn argued the cause for respondent (Messrs. Kapelsohn, Lerner, Leuchter & Reitman, attorneys; Mr. Lawrence E. Maisel, of counsel and on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
The Division of Workmen's Compensation determined that New Jersey had jurisdiction to entertain petitioner's claim for compensation arising from a work-connected accident which occurred in Maryland. The sole issue tried was that of jurisdiction. Since a number of other claims that stem from the same accident are pending before the Division, we granted leave to appeal.
The principal parties involved are:
Department of Labor, Migration Division, of the Commonwealth of Puerto Rico (herein Migration Division). It recruits and registers laborers for seasonal farm employment on the mainland of the United States.
Glassboro Service Association, Inc. (herein Association), a New Jersey corporation, which acts as a migrant workers supply agency for agricultural farms in New Jersey, Delaware, Maryland and Pennsylvania, and is represented in Puerto Rico by Garden State Service Cooperative Association, Inc. (herein Garden State).
Appellant Green Giant Company (herein Green Giant), a Minnesota corporation, which operates farms in Delaware and Maryland.
*9 Petitioner Juan Antonio Rivera, one of several Puerto Rican workers who, on June 20, 1964, were involved in a bus accident while in the employ of Green Giant.
On February 29, 1964 the Association, by its agent Garden State, executed in Puerto Rico a so-called master agreement captioned, "Agreement Between Employers and Puerto Rican Agricultural Workers  1964." The document, approved by the Puerto Rican Secretary of Labor, is printed in Spanish and English and provides, inter alia: "Employer" means the "Association"; the term "Grower" means a member of the Association who has agreed to be bound by the terms and conditions of the agreement. The workers are recruited to work only for the Association or a grower as defined in the contract, and the Association is required to guarantee them minimum hours of agricultural or related work under specified standards and approved conditions. Employment compensation is to be calculated by the Association and the termination and discharge procedure can be effected only at its camp. Both Association and grower are to maintain work records, assume responsibility to the workers for stated services and privileges, and "bring and maintain the Worker within the jurisdiction of the Workmen's Compensation Laws of the State in which the Worker shall be employed." In a concluding paragraph it is agreed that the Association and grower "shall at all times be jointly and severally responsible for the terms of this Agreement."
On March 27, 1964 Association entered into a contract with Green Giant, therein referred to as "Employer," under which the latter proposed to employ 585 agricultural workers to be supplied by the Association, for the period of April 15, 1964 through June 30, 1964. Green Giant agreed to pay 5 1/2% of its gross payroll as its share of the cost of operating the Association's camp at Glassboro, New Jersey, and expressly assumed all obligations of the Association under the master agreement.
On June 1, 1964 Rivera, who had previously registered with the Migration Division for agricultural labor in the United *10 States, signed and received a copy of the master agreement. Thereafter, on the same day, he was flown with a group of 80 to 90 workers to Kennedy Airport. From New York, the men were transported by bus to the Glassboro camp.
Rafael Muniz, an agent of the Migration Division assigned to the Glassboro camp for the 1964 farming season, testified as to the procedure that was followed upon the arrival of the workers. He stated, in substance, that the men were lined up, checked by name, given a badge with a number, served a meal, and requested to attend an orientation session. They were then informed by loud speaker of the various farmers' needs "and usually the men volunteer, they sign in and later on the same day usually they are taken to the farm by the grower."
When interrogated with respect to workers who went to work for Green Giant during 1964, Muniz replied that after orientation the workers were informed that representatives from Green Giant had arrived and that one of them would explain the working conditions, regulations and wages at their farms. The witness continued:
"After that, of course, the men are asked  I very much remember in '64 men were asked on a voluntary basis  let's say we need 40 men, Green Giant is here, they need 40 men. They answer the call and sign in for Green Giant. After the men were selected by the Green Giant representative, then at the same time transportation is provided by Green Giant which would arrive at the camp, buses."
William Hitch, one of the two representatives of Green Giant at the Glassboro camp on June 1, admitted under cross-examination that his company had the right to refuse any worker for any reason whatsoever and, similarly, a worker could reject employment by Green Giant. He further testified that the latter furnished the transportation for its workers from Glassboro to the Green Giant camp in Delaware where they were given a physical examination before commencing work.
The testimony of Rivera was to the effect that he missed the orientation session and the talk given by Green Giant's representative at Glassboro because he had gone to the "men's *11 room" and "I went with a couple of friends toward the canteen." However, he testified that he was told that he was included in a group of 19 assigned to work for Green Giant in the asparagus fields. He also stated that when he boarded the Green Giant bus he and his companions "were checked again," and, when they arrived at the farm in Delaware, they were given a physical examination. Thereafter Rivera worked for Green Giant until the mishap on June 20.
The judge of compensation found that the preponderance of credible proofs established that the employment contract between Rivera and Green Giant was made in New Jersey.
In urging this court to reverse the judgment of the Division, appellant argues: (1) New Jersey should not assume jurisdiction since the master agreement was executed in Puerto Rico and the accident did not occur in this State; (2) if the contract for hire was not entered into in Puerto Rico, then it was made in Delaware; and (3) in any event, New Jersey should, for public policy reasons, disclaim jurisdiction.
In the relevant areas of workmen's compensation and contract law, we are guided by well established legal principles. When an employment contract is made in New Jersey, it is immaterial whether the compensable accident occurs here or elsewhere. Gotkin v. Weinberg, 2 N.J. 305, 307 (1949); Cramer v. State Concrete Corp., 39 N.J. 507, 508 (1963); Filson v. Bell Tel. Labs., Inc., 82 N.J. Super. 185, 191 (App. Div. 1964). But see 2 Larson's Workmen's Compensation Law, § 87.34, "Place of contract as technicality," p. 388 (1961). Ordinarily, the scheme and policy of our Workmen's Compensation Act is embodied, by operation of law, into every hiring agreement made in this State. Gotkin v. Weinberg, supra, 2 N.J., at p. 308; Estelle v. Board of Education of Borough of Red Bank, 14 N.J. 256, 260 (1954); R.S. 34:15-9. If the situs of both the injury and the employment undertaking is outside of New Jersey, our compensation laws are generally not applicable. Franzen v. E.I. duPont deNemours & Co., 128 N.J.L. 549 (Sup. Ct. 1942); Crawford v. Trans World Airline, 27 N.J. Super. *12 567, 570 (Cty. Ct. 1953). Cf. Bowers v. American Bridge Co., 43 N.J. Super. 48, 57 (App. Div. 1956), affirmed o.b. 24 N.J. 390 (1957).
In Gomez v. Federal Stevedoring Co., Inc., 5 N.J. Super. 100 (App. Div. 1949), the availability of compensation protection, incident to a New York accident, turned on where the employment contract was consummated. There, we deemed it was made in New Jersey on the ground that the employee's acceptance of the work offer took place in this State. See also Grogan v. William J. Scully, Inc., 42 N.J. Super. 174, 179-181 (App. Div. 1956).
Here, the master agreement plainly contemplated that the Association was a nominal employer acting only as a medium through which the workers, signatories to the agreement, would be promptly placed with farmers or growers for agricultural work upon their arrival in this country. The Association did not own or operate farms, and the agreement specifically provided:
"The Association which has signed this Agreement represents that it is acting in behalf of and is the agent for each of its members who are Growers seeking to employ the Worker herein referred to."
Rivera and Green Giant met for the first time on June 1 at the Glassboro camp. Up to then neither party was obliged to enter into an employment relationship with the other. The representatives of Green Giant were there for the obvious purpose of engaging workers from the group that had just arrived at the camp. Rivera was included among 19 laborers selected to work at the Green Giant farms and, when he boarded that company's bus for transportation to the job site in Delaware, he became an employee of Green Giant.
The requirement of Green Giant that the men undergo a medical examination at its farm in Delaware before commencing work was in pursuance of a regulation adopted by the company rather than a condition precedent to employment. It was in line with Green Giant's contractual right to *13 call upon the Association "to replace workers as soon as possible who have left or proven unsatisfactory."
In short, after a study of the record we conclude that the proofs adequately establish that the employer-employee relationship commenced at the Association camp in Glassboro.
The essence of appellant's arguments that New Jersey should disavow jurisdiction for reasons of public policy is two-fold, namely, (1) this State should not assume the burden of acting as a "workmen's compensation backstop for some 12,000 to 17,000 workers who were simply funneled through the state to work elsewhere," and (2) saddling administrative costs and employee benefits on New Jersey employers where it is not necessary to protect the workmen is neither just nor sound. Those arguments are not persuasive.
The Association is engaged in an agricultural program to assist the farmers of New Jersey, as well as those in neighboring states. The focal point of its activities is here, at Glassboro, where it maintains a camp for receiving, distributing and returning labor manpower and also performs its administrative and supervisory responsibilities. The joint obligation of the Association and the growers to carry workmen's compensation insurance is clear from a reading of the controlling agreements.
The fact that Rivera might have the right to assert his claim in Maryland, or in some other jurisdiction, would not preclude him from electing to pursue his remedy for compensation benefits in New Jersey. Wilson v. Faull, 27 N.J. 105, 116-117 (1958). But that right of choice does not afford double compensation. Boyle v. G. & K. Trucking Co., 37 N.J. 104, 112 (1962). To the extent that such a choice of forum allows the employee to seek the highest available amount of compensation "it is consonant with the high-minded remedial purposes underlying compensation enactments." Ibid; Cramer v. State Concrete Corp., supra, 39 N.J., at p. 511. See also Leflar, Conflict of Laws, § 138 "Plural Compensation Recoveries," pp. 263-265 (1959). New Jersey has a special interest in the enforcement of its own *14 compensation act and "anything less than the employee's full due is repugnant to the policy of our law." Cramer v. State Concrete Corp., supra, 39 N.J., at p. 511.
The order of the Division is affirmed.